IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JAMES E. QUESENBERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:09cv00109 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | By: Michael F. Urbanski |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff James E. Quesenberry ("Quesenberry") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). On appeal, Quesenberry contends that the Administrative Law Judge ("ALJ") erred by improperly evaluating his complaints of pain and his mental impairments. Having reviewed the record, the undersigned finds the ALJ's decision is supported by substantial evidence. As such, the Commissioner's decision is affirmed and defendant's Motion for Summary Judgment (Dkt. #19.) is **GRANTED**.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure

that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir.

2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Quesenberry was born in 1962, (Administrative Record, hereinafter "R." 92), and is considered a "younger individual" under the Act. 20 C.F.R. § 404.1563(b). He graduated from high school and completed trucking school. (R. 319.) Prior to the alleged onset date, Quesenberry worked as a janitor, truck driver and machine operator. (R. 103, 320-21.)

Quesenberry previously filed an application for benefits on November 29, 2000. The Commissioner denied his application, and the decision was affirmed by the United States District Court. (R. 16.) Quesenberry filed a new application for benefits on December 29, 2004, claiming a disability onset date of November 25, 2002, the date of the ALJ's decision on his

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 404.1529(a).

prior claim.² (R. 15.) His application for benefits was rejected by the Commissioner initially and again upon reconsideration. At an administrative hearing held on February 2, 2006, Quesenberry's counsel requested he be referred for a consultative mental examination. (R. 311.) The ALJ declined to order an exam, noting it would provide insight only into Quesenberry's current state of functioning, not how he functioned on or before December 31, 2004, his date last insured.³ However, the ALJ did agree to continue the hearing so that a medical expert could be present. (R. 311.) The hearing was reconvened on June 27, 2006, and psychologist Charles Holland, Ph.D., testified as an independent medical expert. (R. 314-62.) The ALJ left the record open for thirty days so plaintiff's counsel could submit additional records from the Veteran's Administration ("VA").

In an opinion issued on October 20, 2006, the ALJ found that Quesenberry's degenerative disc disease, degenerative joint disease, depression, anxiety (including PTSD), headaches, and polysubstance abuse in self-reported remission all qualify as severe impairments, pursuant to 20 C.F.R. § 404.1520(c). (R. 18.) Despite the fact that Quesenberry testified he attempted to do some painting for a friend subsequent to the alleged onset date, the ALJ determined that he had not engaged in substantial, gainful employment during the relevant period. (R. 18.) The ALJ further found that Quesenberry has the RFC to perform a limited range of sedentary work. (R. 23.) As regards his mental impairments, the ALJ noted specifically that Quesenberry requires simple, entry-level tasks with minimal contact with the public. (R. 23.) Finding there are a significant number of jobs in the national economy that he can perform,

---

² At the administrative hearing, Quesenberry amended his onset date to November 26, 2002, the day after the ALJ's decision. (R. 316.)

³ To establish a DIB claim, Quesenberry must prove disability on or before his date last insured. 20 C.F.R. § 404.141.

the ALJ held that Quesenberry is not disabled under the Act. (R. 26.) The Appeals Council denied Quesenberry's request for review and this appeal followed. (R. 5-7.)

The issue in this case is whether Quesenberry has met his burden of establishing disability between November 26, 2002 and December 31, 2004. For the reasons outlined below, the court finds that Quesenberry has not. As a result, the Commissioner's decision is affirmed.

### III

Quesenberry first argues on appeal that the ALJ erred by improperly evaluating his complaints of pain and by finding his testimony concerning his pain and limitations not entirely credible. The undersigned finds no such error in the record. The ALJ exhaustively analyzed the medical evidence in this case, and his opinion contains a detailed explanation for his findings. There is ample evidence in the record to support the ALJ's credibility determination.

When faced with conflicting evidence in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and his ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007). Accordingly, the ALJ is not required to accept Quesenberry's testimony that he is disabled by pain, and instead must determine through an examination of the objective medical record whether Quesenberry has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers."). A claimant's statements alone are not enough to establish a physical or mental impairment. 20 C.F.R. § 404.1528(a). "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which

could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591 (citing Mickles v. Shalala, 29 F.3d 918, 922 (4th Cir. 1994)); see also 20 C.F.R. § 404.1529(b). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Quesenberry's testimony about his symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

The record in this case is replete with Quesenberry's complaints of chronic pain in his knees, hip, and back. He testified at the administrative hearing that he must use a cane to walk (R. 323), and that he can sit and stand for only 10 to 15 minutes before his back begins to hurt and he must lie on his heating pad. (R. 324.) Indeed, he states the majority of his daily activities include watching television and lying on his heating pad. (R. 108, 331.)

The objective medical evidence, however, does not support the degree of limitation Quesenberry claims. Records repeatedly note that he is functionally independent. (R. 243, 251, 252, 270.) On two occasions in 2003 and 2004, Quesenberry described his general well being as "good." (R. 243, 251.) At a routine office visit in July, 2003, Quesenberry reported that he was feeling well, going out more, socializing, and making friends. (R. 256.) He was in a good mood (R. 257), and appeared relaxed and comfortable. (R. 252.) Physical examination revealed no joint swelling or redness, no weakness in his extremities, no redness or effusion to his knees, no

crepitance[4] and an upright and steady gait. (R. 252-53.) This progress note indicated Quesenberry was "suspicious for over-compensatory behaviours [sic]." (R. 253.) After complaining that his knees "give out on him frequently," Quesenberry ordered neoprene hinged knee stabilizing braces to provide him more support. (R. 250.) At another routine visit in March, 2004, examination revealed no edema, no joint swelling or redness, no weakness in his extremities, and an upright and steady gait. (R. 243.) He asked for Lortab (but it was not prescribed) and inquired as to "when [P]resident Bush is going to give him a raise in disability money." (R. 243.)

Although there were no diagnostic studies performed during the relevant period, an MRI of Quesenberry's lumbar spine from 2000, referenced in a doctor's note, showed mild disc bulges with no significant stenosis, and images of his right knee revealed distal femur signal changes with suspicion of bone infarction. (R. 263.) The findings are consistent with more recent studies of his spine taken in 2005, which revealed only mild cervical, thoracic and lumbar spondylosis. (R. 189, 191, 193, 209-10.) Quesenberry had an MRI of his hip taken in May, 2005, but it showed no evidence of fractures, subluxations, or areas of bone destruction. (R. 186.) An area of partial opacification of the femoral head was of no clinical significance. (R. 186.) A comparison study to a report from July 2001 showed "essentially no interval change." (R. 187.)

The ALJ adopted the physical RFC set forth by the state agency physicians, who stated Quesenberry could perform a limited range of sedentary work. This RFC accounts for Quesenberry's complaints of pain by limiting his pushing and pulling with lower extremities and

---

[4] The term "crepitant" is defined as rattling or crackling. Dorland's Illustrated Medical Dictionary 433 (30th ed. 2003).

precluding all kneeling. (R. 23.) Additionally, the ALJ found he could only occasionally balance, stoop, crouch and crawl, and could never climb ladders, ropes and scaffolds. (R. 23.)

This RFC determination is consistent with the evidence of record. No doctors say that Quesenberry's pain is totally disabling. On the contrary, notes from March, 2003 state, "[h]is diffuse, chronic pain is difficult to explain on an organic basis. On clinical examination or imaging studies it is difficult to definitely pinpoint the source to explain the severity of his pain. This is further complicated because of significant pain behavior with non-physiological findings." (R. 263.) He has been treated conservatively with medication and had no surgical indications. (R. 263.) Due to his history of drug-seeking behavior (R. 264, 266), his health care providers declined to prescribe narcotics. (R. 253, 263.) He stated in 2003 that OxyContin was the only medication which helped his pain, but changed his story when he was informed that the drug was no longer available in the hospital. (R. 261.) He then mentioned some benefit from Lortab (R. 261) and requested Lortab to no avail at another appointment in 2004. (R. 243.) Notes reveal, "[h]e was also ambivalent and changing statements regarding other medications as well." (R. 261.) Quesenberry claimed at the administrative hearing that he takes Aleve and ibuprofen for pain, because he is "fed up with all the narcotic pills." (R. 327.) In 2005 plaintiff tested positive for marijuana on more than one occasion. (R. 203, 207, 229.) He admitted to smoking marijuana "to ease my pain and my nerves" but stated that as of the administrative hearing in 2006, he was no longer abusing illegal drugs. (R. 336-37.) Additionally, there are a number of references in the record to the fact that he missed scheduled appointments at the VA. (R. 195, 240, 242, 266, 284, 285.)

Records from 2005, after Quesenberry's date last insured, lend further support to the ALJ's credibility determination in this case. Plaintiff stated his pain was controlled with

medication in April (R. 205), but at a Compensation and Pension Exam in May, he stated he could not walk the length of a football field, complained of weakness and swelling (R. 198), and complained of pain prior to, during, and after the physical examination. (R. 201.) The report noted, plaintiff's pain "appears to be out of proportion as compared to his physical exam done on his April 4th exam." (R. 200.)

Based on this record, the court finds no reason to disturb the ALJ's credibility assessment. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). Allegations of pain and other subjective symptoms, without more, are insufficient to establish disability. Craig, 76 F.3d at 592.

## IV

Quesenberry also argues that the ALJ improperly evaluated his non-exertional limitations. Specifically, he claims that the ALJ should have found that he is precluded from any contact with the public and "given his paranoia, distrust and irritability, the plaintiff would have marked limitations in getting along with co-workers and accepting instructions and criticism from his supervisors." (Pl.'s Br. 12-13.)

At the administrative hearing, Quesenberry testified that he does not have any friends because other people irritate him and claimed that he does not trust people at the VA. (R. 326-27.) He testified that he has trouble sleeping because of recent worries about someone vandalizing his car in the parking lot (R. 332), and his records being stolen from the VA. (R. 328, 333.) However, these complaints do not relate to the period in question. Quesenberry admitted at the hearing that his concerns about vandalism and stolen records were recent,

occurring in the past six weeks. (R. 341.) Additionally, records reveal that during the relevant period, Quesenberry reported he was feeling well, going out more, socializing and making friends. (R. 256.)

Contrary to his assertions on brief, Quesenberry has not been diagnosed with paranoia, nor does he complain of paranoia. Although he states that he receives ongoing treatment for PTSD, these treatment records are not in the evidence before the court, and none of the mental health records indicates a diagnosis of PTSD. Quesenberry's diagnoses during the period in question include substance-induced mood disorder and mild depression. (R. 244, 253, 258, 264, 270.) However, notes reveal his depression is controlled with medication (R. 249; see also R. 266), and some notes even state his depressive disorder was in remission. (R. 241; see also R. 236.) In January, 2004, Quesenberry reported his mood was good, he had been collecting stones and arrowheads as a hobby, he had a good relationship with his girlfriend and teenage son, and his medication was working to control his depression. (R. 248-49.)

Quesenberry reported increased anxiety and depression in November, 2004, which he attributed to financial stress and problems with his son. (R. 237.) Records indicate he had poor eye contact and complained of difficulty focusing, intermittently low moods, irritability, and decreased energy. (R. 237.) However, he denied suicidal or homicidal thoughts. (R. 237.) He also denied using illegal substances but exhibited reluctance to submit to a urine test, stating, "[m]aybe we can schedule a urine test on the next visit here." (R. 237.) Dr. Ferraz diagnosed him with depressive disorder not otherwise specified, anxiety disorder not otherwise specified, rule out substance-induced mood disorder. (R. 238.) He was advised to increase his dosage of Venlafaxine and seek counseling, which would include urine drug screens. (R. 238.) As to this recommendation, notes reveal "the patient declined for no specified reason on his part." (R.

238.) He was discharged "without evidence of a thought disorder and is judged not to be actively suicidal or homicidal...." (R. 238.) The following month, in December, 2004, Quesenberry stated that his son was doing better, his stressors had resolved, and he asked to return to his previous lower dose of medication. (R. 235-36.) In the spring of 2005 he tested positive for marijuana, and explained he had attended several birthday parties in the past month where people had been smoking the drug. (R. 203, 207.) In a Compensation and Pension Exam in April, 2005, Quesenberry was noted to have a mildly restricted affect, appropriate behavior, adequate eye contact, no panic attacks, and no impairment of memory, thought processes or communication. (R. 202.) Contrary to prior assertions, he stated that his current medication was not working and the only thing that had helped him was Valium. (R. 202.)

Throughout the period in question, notes reveal Quesenberry had no psychotic symptoms and was not suicidal or homicidal. (R. 250, 265, 266.) His Global Assessment of Functioning fluctuated between 55 and 60.[5] (R. 238, 241, 250, 257, 264, 265, 266.) State agency physicians reviewed his medical records and found Quesenberry moderately limited in certain areas, including his ability to interact with the public, accept instructions from supervisors, get along with co-workers, and maintain socially appropriate behavior. (R. 171.) At the administrative hearing, Dr. Holland testified as an independent medical expert that Quesenberry had no medically determinable mental impairment during the relevant period. (R. 343.) Dr. Holland based his opinion on the fact that GAFs were in the moderate range from December 2001 through April 2005, that only mild depression and anxiety are noted in the record, that

---

[5] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994). A GAF of 51-60 indicates than an individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . ." Id. at 34.

Quesenberry exhibited no suicidal thoughts, and that he had been non-compliant with medication and engaged in drug-seeking behavior. (R. 342-43.)

Taking his mental impairments into account, the ALJ limited Quesenberry to simple, entry-level tasks with minimal contact with the public. (R. 23.) Substantial evidence in the record supports the ALJ's RFC determination. There is no evidence of a marked limitation in any area of functioning, and none of plaintiff's medical records indicate he must be precluded completely from interaction with the public. The ALJ adequately took into account Quesenberry's mental impairments, and for that reason, the Commissioner's decision must be affirmed.

V

At the end of the day, it is not the province of the reviewing court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence and, in this case, substantial evidence supports the ALJ's opinion. In affirming the final decision of the Commissioner, the court does not suggest that Quesenberry is totally free of all pain and subjective discomfort. The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Quesenberry's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed and defendant's motion for summary judgment (Dkt. #19) is **GRANTED**.

The Clerk of Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered: July 26, 2010.

/s/ Michael F. Urbanski

Michael F. Urbanski
United States Magistrate Judge